IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| PARRIS ELAINE KEANE,<br><br>     Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner, Social Security Administration,<br><br>     Defendant. | Case No. 3:18-cv-0357<br><br>Chief District Judge Crenshaw<br>Magistrate Judge Holmes |

To:    The Honorable Waverly D. Crenshaw, Chief District Judge

## REPORT AND RECOMMENDATION

    Pending before the court is the plaintiff Parris Elaine Keane's Motion for Judgment on the Administrative Record (ECF No. 13), to which the defendant Social Security Administration (SSA) has responded (ECF No. 15), and Keane has replied. (ECF No. 16.) This suit involves an application for supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq*. Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title XVI "to the same extent as the Commissioner's final determinations under section 405 of this title." 42 U.S.C. § 1383(c)(3). At issue is whether the administrative law judge (ALJ) erred in finding that the plaintiff was not entitled to supplemental security income (SSI) benefits. (ECF

No. 10 at Tr. 65-76).[1] This matter has been referred to the magistrate judge, pursuant to 28 U.S.C. § 636(b), for initial consideration and a Report and Recommendation.

Upon consideration of the parties' briefs, the transcript of the administrative record (ECF No. 10), and for the reasons offered below, the undersigned respectfully RECOMMENDS that the plaintiff's Motion for Judgment on the Administrative Record be DENIED and the decision of the SSA be AFFIRMED.

## I. Introduction

The plaintiff filed her SSI application on August 29, 2014, alleging disability onset as of September 30, 2008. (ECF No, 14, Page ID# 657-58; Tr. 10, 159-65.) Her claim to benefits was denied at the initial and reconsideration stages of state agency review. (Tr. 83, 103, 107-09, 111-16). The plaintiff subsequently requested de novo review of her case by an Administrative Law Judge (ALJ). (*Id.*) The ALJ heard the case on April 8, 2017, when the plaintiff appeared via video conference from St. George, Utah. (Tr. 10.) The ALJ presided over the hearing in Nashville, TN where plaintiff's counsel also appeared. (Tr. 75-80.) Testimony was received from a vocational expert ("VE") and the plaintiff's mother. (Tr. 80-82.) At the conclusion of the hearing, the matter was taken under advisement until April 5, 2017 when the ALJ issued a written decision finding that the plaintiff was not disabled. (Tr. 21.)

That decision contains the following enumerated findings:

1. The claimant has not engaged in substantial gainful activity ("SGA") since August 29, 2014, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: traumatic brain injury (TBI), mild neurocognitive disorder, migraine headaches, lumbar spondylosis, oculomotor dysfunction, depression, anxiety, and attention deficit hyperactivity disorder (20 CFR 416.920(c)).

---

[1] The Administrative Record is hereinafter referenced by "Tr." followed by a page number which can be found in large black print on the bottom right corner of each page.

2

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

4. [T]he claimant has the residual functional capacity to lift and carry 10 pounds occasionally up to 20 pounds; can stand and/or walk for a total of 6 hours in an 8-hour workday, can sit for a total of 6 hours; must avoid concentrated exposure to noise and bright lights; can understand, perform, and carry out simple instructions and tasks; can maintain concentration, persistence, and pace for 2 hours at a time over an 8-hour workday; can interact frequently with co-workers, supervisors, and the general public; and can adapt to infrequent changes in the workplace.

5. The claimant has no past relevant work (20 C.F.R. 416.965).

6. The claimant was born on October 1, 1993 and was 20 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 C.FR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964.)

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since August 29, 2014, the date the application was filed (20 CFR 416.920(g)).

(Tr. 10-21.)

On February 5, 2018, the Appeals Council denied the plaintiff's request for review of the ALJ's decision (Tr. 1–6), thereby rendering that decision the final decision of the SSA. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's

3

findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive. *Id.*

### III. Review of the Record

The ALJ summarized the plaintiff's medical records as follows:

The record documents a fairly lengthy history of treatment, most notably speech, physical, occupational, and outpatient mental health therapy and Botox injections, for a variety of physical and mental symptoms stemming from a TBI the claimant reportedly sustained in September 2008 and it shows she has since been variably diagnosed with a TBI with residuals, post-concussion syndrome, restless legs syndrome, spasmodic torticollis, occipital neuralgia, supraorbital neuralgia, migraines, exophoria, attention deficit hyperactivity disorder (ADHD), a cognitive disorder not otherwise specified (NOS), a mild neurocognitive disorder, post-traumatic mood disorder, depressive disorder NOS, major depressive disorder, anxiety disorder NOS, panic disorder, and/or several other sequelae-related disorders ("Her current symptoms all began after a head injury,: etc.) (Ex. 1F-5F, 7F-10F, 13F, and 15F-17F.)

However, aside from clinical testing yielding results consistent with some vision and motor deficits in July 2014 and x-rays recently revealing some scoliosis and degenerative changes to the claimant's lumbar spine in February 2016, the record does not appear to document diagnostic evidence of any other significant physical pathology, let alone any that would have been expected to produce more than minimal functional limitation for a period of 12-consecutive months since the application date ("She has completed a sleep study with normal results", "Per mother the patient recently completed a dilated eye exam with normal results," etc.) (Ex 1F-5F, 9F, 16F, and 17F). In fact, the record shows diagnostic imagining and testing of the claimant's head/brain have consistently been within normal limits ("She has had multiple scans with no positives," "An EEG is normal," "Ms. Keane's CT scan of her head was normal," "Normal MRI," etc.) (Ex. 1F-5F and 9F). Moreover, the record shows the severity of the motor deficits in July 2014 as well as the severity of the scoliosis and degenerative changes present in February 2016 were described as being no more than mild ("Mild gross motor coordination deficits of lower extremities, left greater than right," "There were no indications of difficulties with fine motor control here," "Slight levoconvex scoliosis of L-spine," etc.) (Ex 4F, 5F, and 17F).

Furthermore the record certainly does not document any ongoing objective clinical manifestations of any significant physical pathology, let alone any that would have been expected to produce more than minimal functional limitation for a period of 12-consecutive months since the application date ("The patient is in no distress," "No craniofacial defects," Parris showed distance

4

uncorrected visual acuity of 20/20 in the right eye and 20/20 in the left eye," "Visual fields were intact," "Normal respiratory effort without wheezes or rales," "Full range of motion," "The patient moves all extremities equally," "Motor normal," "The strength of the major muscle groups is graded at 5/5," "No pedal edema," "2+ pedal pulse bilaterally," "Sensory testing for light touch is intact in the upper and lower extremities," "Reflexes normal," "2/4 DTR's elicited in biceps, triceps, brachioradialis, patellar, and ankle jerks," "Coordination is within normal limits," "Finger-to-nose intact," "No gait deviations noted," "The gait is normal the patient can walk several steps, then turn, and come back," etc.) (Ex. 1F-3F, 7F-10F, and 14F-17F.)

Similarly, although clinical testing yielded some results consistent with residual cognitive deficits as well as some impaired attention span, the record shows the severity of these deficits and impairment were described as being no more than mild and several other clinical tests yielded results that were within normal limits, including intelligence testing administered in April 2009, August 2010, and July 2014 ("Parris presents with mild cognitive-linguistic deficits most notably in the area of cognition characterized by deficits in higher level executive functioning skills," "This is a test of mental/motor sequencing abilities shown to be very sensitive to acquired brain dysfunction. . . she likewise performed the tasks within an acceptable degree of speed, scoring solidly within average limits," "On the Woodcock Johnson Test of Cognitive Ability – Concept Formation, Parris had a raw score of 32 . . . placing her [in] the high average range," "from the WAIS-IV, her full scale IQ was 94," "Parris scored WFL in verbal expression," "Parris's reading comprehension skills were within functional limits," "She did not appear depressed on the Clinical Assessment of Depression," etc.) (Ex. 4F, 5F, and 9F).

Moreover, the record certainly does not document any ongoing objective clinical manifestations of any significant mental pathology, let alone any that would have been expected to produce more than minimal functional limitation for a period of 12-consecutive months since the application date ("Cognitive function is normal on MMSE," "Alert and oriented for person, place, location and situation," "The patient is well groomed and well dressed," "Grooming and hygiene reflected that she was neat and clean," "Speech is fluent and the affect appropriate," "No abnormalities of mood or affect," "Apparent mood was normal," "Affect was of normal range," "She appeared to be entirely comfortable with the office setting," "Pleasant to speak with," "Her social skills were excellent," "Psychomotor activity revealed no abnormalities," "Apparent concentration was intact," "Parris had no difficulties in paying attention to direction, following directions, and completing tasks," "Memory of recent events was intact and very detailed, as evidence by her ability to relate to me the events of the morning prior to arriving at my office," "Comprehension of language was intact," "Form of thought was logical and appropriately abstract," etc,) (Ex. 1F-3F, 5F, 7F-10F, and 13F-17F). Not to mention, the records shows the claimant was assessed with

5

Global Assessment of Functioning scaled score of "65-70," which is simply indicative of mild corresponding functional impairment, in December 2014 (Ex. 13F).

Frankly, aside from complaints of recurrent headaches, the record does not actually document any ongoing complaints of fatigue, mood swings, dizziness, crying spells, or any other physical or mental symptoms, let alone any since the application date. In fact, the record shows any other physical or mental symptoms the claimant may have been experiencing either resolved or were no more than minimal (Follow up of restless legs syndrome . . . She is no longer on medication for this," "She estimates that the frequency of this system is rare," "Current medication include only Prilosec and Flonase," "She reported minimal challenges as a result of her tremor," "Negative for confusion, dizziness, fainting, memory loss, paresthesias, seizures, speech disorder, tremor, vertigo, weakness or gait disorder," "She had no current concerns or complaints," "In addition, depressive syndrome is noted by the patient . . stable on no medications," "She is not currently on any medications and reports feeling better without them at this time," "Socially her mother described her as doing fine . .  said that her peers often turn to her for help, and she is very reliable and stable," "There are no current issues with disruptive behavioral problems," "She certainly related very well to the examiners today," "Emotionally she seems to be doing well," etc.) (Ex. 1F, 4F, 5F, 9F, and 13F-15F).

Meanwhile, although the record does show the claimant has been prescribed multiple medications and received several injections for her migraines, the record certainly does not document any hospitalizations or frequent emergency room visits in status migrainous. In fact, the record shows the claimant's migraine headaches have generally been well controlled with treatment and any recent breakthrough headaches she experiences have largely been precipitated by noncompliance (Decided against Botox as headaches are no longer daily," "These eventually improved by 2012 with Botox injections," "Mom reports that her migraines had been well controlled after Botox treatments," "Around that time,  she also experienced a notable decrease in her experience of migraine headaches," "She believes that the combination of these two events resulted in a notable improvement in her migraines, decreasing to once or fewer a month for two years," "she has not experienced a migraine since her injection," "Reports headaches are greatly improved after starting Bystolic 2.5 wks ago," "Symptoms are better with meds," "Last Botox injection . .  has worked quite well," "Zispor helps as well," "She reported that she continues to get headaches however she feels like they have improved," "Symptoms are better with meds," "She is better on bystolic," "Symptoms are better with current medications," "Dr. Overall has been doing Botox which is helpful." "She thinks they are helpful," "She is quite happy with this," "She stopped taking all her routine medications 3 weeks ago," "She tends to manage her own medications per her convenience since she seems to think being on

6

routine medications for her headaches does not really stop her from having headaches," "She continues to have daily headaches worsening since she stopped taking her prophylactic medications since last several week[s], her headaches prior to that were much better so she stopped taking every single routine medication," etc.) (Ex. 1F, 4F, 5F, 7F, 9F, 10F, and 15F-17F).

Maybe most telling, the records, shows the claimant independently preparing meals, performing household chores, managing her finances, driving, shopping in stores, and engaging in a variety of other activities that are not consistent with those of an individual suffering from such alleged incapacitating symptoms ("She lived independently for one year at which time she was responsible for high level home management tasks," "She reported independence with simple meal preparation and laundry skills," "She currently holds a checking account and is responsible for paying for gas, food and social activities," "She holds a valid TN driver's license and is currently driving," "Parris reported independence with bathing, dressing and grooming tasks," "She likes to walk and hike and climb at the rock climbing gym," "She hangs out with her friends and cooks," "She likes to paint," "She is able to perform all of her own self-care," "She is able to shop for herself," "She has a driver's license and drives herself where she needs to go," "She manages her own money," "She has three close friends," "She reported that she could do household chores, cooking, laundry, and caring for children," "She reported socializing and doing volunteer work," "She reportedly enjoyed music, poetry, reading, drawing, and using the computer," "During the day, she said that she might do crafts, look at magazines, or play games," "She volunteers at a nursing home," etc.) (Ex. 7E, 4F, 5F, 8F-10F, 14F, 15F, 17F, and Hearing).

Even more telling, the record shows the claimant graduated from high school with a regular education diploma and she has been pursuing higher-level education ("She graduated from high school with a regular diploma, had attended Dixie State University in Utah from Jan. until Dec. 2013, and was attending Nashville State Community College majoring in Social Work," "Her grades were A's, B's and C's," "Currently she is attending Nashville State Community College where she has been attending since January 2014," "Client has been accepted to the University of Tennessee at Chattanooga and plans to transfer there in August 2014," "States that she started school back up 6 months ago," etc.) (Ex. 7E, 4F, 5F, 8F-10F, 14F, 15F, 17F, and Hearing).

The record also shows the claimant has been working, albeit on a part-time basis, as well ("Employment history includes part-time positions as a Private Child Care Provider, Service Staff Member at Chipotle Mexican Grill twice, Beauty Consultant at Ulta Beauty, Sales Associate at Soma Intimates and currently an Assistant at Climb Nashville," "She had also work[ed] in restaurants, as a babysitter, as a sale person, and as a beauty consult[ant] (for which she has certification)" "She also earned a make-up artistry certificate

7

from the Transformation Studio in 8/12," "Ms. Keane presently works at a local rock climbing gym," etc.) (Ex. 2E, 3E, 10E, 4F, 5F, 9F, and Hearing).

Not to mention, the record certainly suggests any discontinuation of the claimant's education and employment were, at least partially, if not primarily, due to reasons unrelated to disability ("She completed a year of college there with a 3.5 GPA, returning to Nashville at the end of 2013 because she missed her family," "(1) Climb Nashville, belayer, 2/14 – present; (2) Chipotle Mexican Grill, service staff – 12/13-2/14. Resigned due to job not being a good fit; (3) Mr. Kale Goodman, private child care provider, 1/13-10/13, resigned due to moving; (4) Ulta Beauty consultant, 1/13-8/13, resigned due to school; (5) Chipotle service staff – 12/13-2/14, resigned due to moving; (6) Soma Intimates, sales associate, 8/12-12/12, resigned due to moving; (7) CareHere, LLC, data entry, 10/10-10/11, resigned due to school; (8) Mr. & Mrs. James Usdan private child care provider, 10/06-2012, resigned due to moving," etc.) (Ex. 4F and 9F).

Nevertheless, the undersigned will weigh the evidence above in the claimant's favor and reduce her residual functional capacity accordingly.

As for the opinion evidence, the State agency consultants are to be considered and weighed as those of highly qualified physicians and psychologists who are experts in evaluation of the medical and psychological issues in Social Security disability claims (20 CFR 416.927 and 416.1016) and the undersigned correspondingly gave their physical and mental assessments (Ex. 1A and 3A) significant consideration. However, the undersigned only gives partial weight to the State agency medical consultant's physical assessment (Ex. 1A and 3A) because they did not adequately consider the claimant's subjective complaints. The undersigned will weigh the evidence above in the claimant's favor and further reduce her residual functional capacity such that she can only perform the exertional range of light work.

The undersigned gives little weight to the medical sources statement provided by the claimant's treating chiropractor, Donald Henderson (Ex. 12F), D.C. in October 2014 because his opined limitations appear to have been based almost exclusively upon the claimant's subjective self-reported abilities when she is suffering from a migraine, particularly given that he did not cite any objective medical findings to support them and the only impairment he referenced was her headaches ("Without headaches all answers Yes," etc.) It is also worth noting that Mr. Henderson reported the claimant should no longer have headaches with proper care ("With proper care her headaches will cease, thus no limitations") (Ex. 12F). Regardless, the undersigned gives little weight to Mr. Henderson's medical source statement because it is not well supported by objective medical findings and it is inconsistent with the record as a whole. For example, Mr. Henderson opined that the claimant can only reach and push/pull with the bilateral upper extremities on an occasional basis, yet the record does

8

not document objective medical evidence showing the claimant's ability to use either upper extremity has been more than minimally limited, certainly not since the application date (Ex. 12F).

Similarly, the undersigned also only gives partial weight to the State agency psychological consultants' mental assessments (Ex. 1A and 3A) as well because they did not adequately consider the claimant's subjective complaints either. The undersigned will also weigh the evidence above in the claimant's favor and further reduce her residual functional capacity such that she can only understand, remember, and carry out simple instructions and tasks; interact frequently with co-workers, supervisors, and the general public; and adapt to infrequent changes in the workplace.

Meanwhile, although they did not specifically address the claimant's ability to perform basic work activities, the residual functional capacity determined above is nevertheless consistent with, if not more restrictive than, the results of neuropsychological evaluations conducted by Dr. James Walker (Ex. 5F) and Dr. Pamela Auble (Ex. 9F) in July 2014 and September 2014 respectively as well as the vocational rehabilitation evaluation conducted by Trevecca Griffin, M.A. (Ex. 4F), in July 2014.

The undersigned gives little weight to the highly restrictive medical source statement provided by Dr. Trenton Overall (Ex. 10E) in September 2015 because, much like Mr. Henderson, his medical opinion appears to have been based almost exclusively upon the claimant's subjective self-reports and complaints of migraine symptoms rather than objective medical findings ("She has significant impairment because of her headaches and is unable to work because of the pain", etc.). Regardless, the undersigned gives little weight to the highly restrictive medical source statement provided by Dr. Overall (Ex. 10E) because it is wholly inconsistent with the longitudinal record. For example, Dr. Overall opined that the claimant has marked restriction in her activities of daily living as well as marked difficulties maintaining social functioning and she would be expected to decompensate with even a minimal increase in her mental demands or change in environment because she suffers from multiple headaches on a daily basis that last several days (Ex. 10E). Yet, in addition to the evidence already discussed above, the claimant and/or her mother even testified at the hearing that the claimant is currently living in an apartment by herself, taking a college course, working part-time, driving, and socializing with friends, including her boyfriend, which is wholly inconsistent with an individual suffering from the limitations opined by Dr. Overall.

Finally, the undersigned only gives partial weight to the information and statements provided by the claimant's mother in a Function Report (Ex. 4E) completed in September 2014 as well as her subjective testimony during the hearing because they were not consistent with the longitudinal record, particularly since the record shows the claimant has been and is currently living

9

independently on her own, taking college courses, and working part-time (SSR 06-03p).

The record does not contain any other opinion evidence that addresses the claimant's ability to perform basic work activities since the application date, let alone any suggesting she is disabled.

(Tr. 14-19.)

## IV. Conclusions of Law

### A. Standard of Review

This court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." *Miller*, 811 F.3d at 833 (quoting *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014)).

## B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The SSA considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 862 (6th Cir. 2011) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. If the ALJ determines at step four that the claimant can perform past relevant work, the claimant is deemed "not disabled" and the ALJ need not complete the remaining steps of the sequential analysis. *Id.* § 404.1520(a).

"Past relevant work" is defined as work that claimants have done within the past fifteen years that is "substantial gainful activity" and that lasted long enough for the claimant to learn to do it. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006) (citing 20 C.F.R. § 404.1560(b)(1)).

The claimant bears the burden through step four of proving the existence and severity of the limitations her impairments cause and the fact that she cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . ." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 628 (6th Cir. 2016) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. *Wright*, 321 F.3d at 615–16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity (RFC) at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical,

12

exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. The Plaintiff's Statement of Errors

The plaintiff contends that the ALJ failed to consider the VE's answer to two hypothetical questions which, had the VE's response been considered, would have resulted in a finding that the plaintiff was disabled. The plaintiff argues that because the ALJ did not address the VE's testimony regarding these two hypotheticals, remand is required. Specifically, relying on two inapposite Ninth Circuit cases,[2] the plaintiff contends that "[r]emand for further proceedings is appropriate where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated." (ECF 14, Page ID# 661.)  The plaintiff does not identify what "outstanding issues remain [to] be resolved" nor does she identify any evidence that was not "properly evaluated." Indeed, she does not suggest that the ALJ's decision was not supported by substantial evidence, and even if she had made such a suggestion, she does not identify any evidence that the ALJ should have but did not consider, any evidence the ALJ improperly discounted or unfairly weighed, nor does she, except in the most general way, discuss the evidence at all. (*Id.* at PageID# 658.) Before considering the plaintiff's argument then, it is worth noting what the plaintiff does not argue: the plaintiff does not argue that the ALJ's decision was not supported by substantial evidence.

The United States Supreme Court recently explained that:

The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. *T-Mobile South, LLC*

---

[2] *See Vasquez v. Astrue*, 572 F.3d 586, 593 (9th Cir. 2009) (establishing, in the Ninth Circuit, a two-step analysis for evaluating the credibility of a claimant's testimony regarding subjective pain); *cf. Reddick v. Chater*, 157 F.3d 715, 729 (9th Cir. 1998) (analyzing subjective complaints of pain in the context of disabling chronic fatigue syndrome.)

13

> *v. Roswell*, 574 U. S. ___, ___, 135 S.Ct. 808, 815, 190 L.Ed.2d 6679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. *Consolidated Edison Co. v. NLRB*, 305 U. S. 197, 229 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." *Ibid.*; *see, e.g., Richardson v. Perales*, 402 U. S. 389, 401 (1971) (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion*." Consolidated Edison*, 305 U. S., at 229. *See Dickinson v. Zurko*, 527 U. S. 150, 153 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

*Biestek v. Berryhill*, No. 17-1184, 2019 WL 1428885, at *3 (U.S. Apr. 1, 2019). In the absence of any suggestion by the plaintiff that the ALJ's decision was not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," the plaintiff's sole argument is that the ALJ insufficiently considered the VE's response to the hypothetical questions posed by the ALJ and her counsel.

Toward the end of the hearing, the ALJ questioned the VE regarding the plaintiff's ability to work, consistent with the requirements of the DOT, based on a variety of hypothetical situations. Because the ALJ determined that the plaintiff had no past relevant work (Tr. 20), a determination that the plaintiff does not dispute, the ALJ proceeded to step five of the sequential evaluation process and obtained testimony from the VE regarding other work the plaintiff could perform (Tr. 20-21, 60-64). In response to a hypothetical question, the VE testified that a hypothetical person of the same age and work history as the plaintiff with an RFC as determined by the ALJ could perform the requirements of certain representative unskilled, light exertional level occupations such as cashier (DICTIONARY OF OCCUPATIONAL TITLES (DOT) No. 211.462-010) with 3,000,000 jobs available nationwide; ticket seller (DOT No. 211.467-030) with 1,000,000 jobs available nationwide; and maid (DOT No. 323.687-014) with 2,000,000 available jobs available nationwide (Tr. 20-21, 60-61).

14

The hypothetical questions on which the plaintiff focuses here asked the VE to consider whether work would be available for a hypothetical person similar in age, work history and RFC to the plaintiff, if the hypothetical person were required to take at least two additional 15-minute breaks at least twice a week due to headaches and exacerbations of her symptoms or were routinely required to take at least one additional day off per week. (ECF No. 14, Page ID# 661-62.)[3] Unsurprisingly, the VE responded that such a hypothetical person would not be able to work. (Tr. 63-64.)

However, the ALJ was not required to discuss these hypotheticals in her decision because they set out more restrictive limitations than the ALJ found to be supported by evidence in this case. *See Walton v. Comm'r of Soc. Sec.*, 60 F. App'x 603, 611 (6th Cir. 2003) (explaining that the ALJ properly relied on the VE's response to a hypothetical question that was based on the limitations that were credited by the ALJ and supported by substantial evidence on the record); *Bolton v. Colvin*, No. CV 15-11838, 2016 WL 6651792, at *6 (E.D. Mich. June 3, 2016), report and recommendation adopted sub nom. *Bolton v. Comm'r of Soc. Sec.*, No. 15-CV-11838, 2016 WL 4394330 (E.D. Mich. Aug. 18, 2016) ("Bolton argues that the ALJ erred in disregarding the hypothetical questions posed to the VE by his attorney, but the ALJ was not required to consider answers to all hypothetical questions. "Rather, the ALJ properly relied on the VE's response to a hypothetical question that was based on the limitations that were credited by the ALJ and supported by substantial evidence on the record." (quoting *Walton v. Comm'r of Soc. Sec.*, 60 F. App'x. 603, 611 (6th Cir. 2003).)

---

[3] Notably, the ALJ asked the VE the hypothetical regarding the need for additional breaks (Tr. 63), but the plaintiff's counsel asked the VE the hypothetical regarding the additional day off (Tr. 64).

Because the ALJ did not find that these hypothetical requirements—additional time off or needing additional breaks during the workday—were supported by substantial evidence, a fact that the plaintiff does not dispute, the ALJ was not obligated to accept or discuss the VE's response to hypothetical questions reflecting these unsupported limitations. *See Kendrick v. Astrue*, 886 F. Supp. 2d 627, 639 (S.D. Ohio 2012) (explaining that "the ALJ needs to incorporate only those limitations that he or she accepts as credible.")

Moreover, because the VE gave testimony in response to a hypothetical question that incorporated the work-related limitations the ALJ included as part of the RFC finding after weighing the evidence in the plaintiff's favor, the ALJ was permitted to rely upon the VE's testimony to support her step five finding. *See, e.g., Branon v. Comm' r of Soc. Sec.*, 539 F. App' x 675, 680-81 (6th Cir. 2013) ("So long as the hypothetical is accurate, the administrative law judge may rely on the vocational expert's testimony to find that the plaintiff can perform a significant number of jobs in the national economy.").

Substantial evidence supported the ALJ's decision and she did not err in her consideration of the VE's testimony or the record and opinion evidence as a whole.

## V.  Conclusion and Recommendation

For the reasons explained above, the undersigned respectfully **RECOMMENDS** that Plaintiff's motion for judgment on the administrative record (ECF No. 13) be **DENIED**, and the SSA's decision be **AFFIRMED**.

The parties have fourteen (14) days after being served with a copy of this Report and Recommendation to serve and file written objections to the findings and recommendation proposed herein.  Responses to the objecting party's objections to this Report and Recommendation must be filed within fourteen (14) days after being served with a copy of the

objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, 142, *reh'g denied*, 474 U.S. 111 (1986); *see Alspaugh v. McConnell*, 643 F.3d 162, 166 (6th Cir. 2011).

                                                              Respectfully submitted,

                                                              _____
                                                              BARBARA D. HOLMES
                                                              United States Magistrate Judge